JS

IN THE UNITED STATES DISTRICT COURT
FOR THE EATERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Alexandar Bratic<br><br>Plaintiff,<br>vs.<br><br>Tech Solutions Sync and<br><br>Sambit Mivhi Raina,<br><br>38974 SWORDFISH CMN<br><br>Fremont, CA, 94536. | ~~FIRST AMENDED COMPLAINT~~<br><br>CIVIL ACTION NO. **19 851**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION DAMAGES AND OTHER RELIEF** |

**PLAINTIF's COMPLAINT**

I. **INTRODUCTION**

1. Plaintiff Alexander Bratic brings this action against above named Defendants, pursuant to The Telephone Consumer Protection Act of 1991 (TCPA), codified as 47 U.S.C. § 227, the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101 - 6108, to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

1

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), and 6105(b).

3. Venue is proper in this district under 28 U.S.C. §§ 1391(b), (c), and (d), and 15 U.S.C. § 53(b), since Defendants have engaged in their illegal activates by purporting to provide their services in the area of Eastern District of Pennsylvania.

4. Telemarketing Act, 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices in or affecting commerce.

5. The Telephone Consumer Protection Act of 1991 (TCPA) was passed by the United States Congress in 1991 and signed into law as Public Law 102-243. It amended the Communications Act of 1934. The TCPA is codified as 47 U.S.C. § 227.

6. The TCPA restricts telephone solicitations (i.e., telemarketing) and the use of automated telephone equipment. The TCPA limits the use of automatic dialing systems, artificial or prerecorded voice messages, SMS text messages, and fax machines. It also specifies several technical requirements for fax machines,

autodialers, and voice messaging systems—principally with provisions requiring identification and contact information of the entity using the device to be contained in the message.

7. Defendant Tech Solutions Sync ("Tech") is or was a California limited liability company with its principal place of business at the above captioned address in California.

8. Tech transacts or has transacted business in this district and throughout the United States.

9. Defendant Sambit Mivhi Raina, ("Sambit") is or was a sole member of Tech. He is or has been the sole signatory to the bank accounts of Tech and has identified himself as the "Owner with Control of the Entity" with respect to Tech. Tech is registered at his address captioned above. Sambit owns the property where Tech is registered as principal office of business.

10. At all times material to this Complaint, Sambit, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Tech, including the acts and practices set forth in this Complaint, transacts or has transacted business in this district and throughout the United States.

11. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

12. Beginning in at least 2015, Defendants have provided substantial support and assistance to an Indian tech support scheme in which purported technicians illegally obtain older consumers' personal information without their permission while deceiving those consumers into purchasing phony or otherwise suspect technical support services.

### *The Tech Support Scheme*

13. The tech support telemarketers contact consumers by either cold-calling them and pretending to be representatives of a well-known technology company, or by using pop-up advertisements disguised as security alerts that direct consumers to immediately call a telephone number to protect their computer.

14. Regardless of the initial method of contact, the scheme proceeds similarly once the telemarketer has the consumer on the phone. Emphasizing the need for immediate action, the telemarketer claims that the consumer's computer is at risk and that the telemarketer can assist the consumer but first needs remote access to the consumer's computer. Once remotely connected, the telemarketer purports to confirm the existence of a serious cyber-threat, sometimes claiming that a hacker will soon be able to access the consumer's personal information,

4

including financial account numbers, social security numbers, and passwords. The telemarketer also sometimes tells the consumer that a hacker is attempting to steal a large sum of money from the consumer's bank account.

15. Imparting a sense of urgency, the telemarketer ("P.C. tech.") claims he will install expensive and high-quality network security software to resolve the problem in exchange for a substantial sum of money. The telemarketer frequently represents that the security software is affiliated with the U.S. government, or reputable companies like Microsoft.

16. If the consumer agrees to the telemarketer's offer, the telemarketer installs junk software or older versions of security software, such as anti-malware, that are available elsewhere for free or for a fraction of the price quoted to the consumer by the telemarketer.

17. While remotely connected to the consumer's computer, the telemarketer frequently removes copies of the consumer's tax returns and other documents found on the consumer's computer seeking personal information.

18. After the telemarketer purports to have installed high-quality network security software, he instructs the consumer to pay by credit card, mailing a check to a given address. The cost to the consumer ranges between several hundred to tens of thousands of dollars.

19. Plaintiff has paid them over several thousand dollars in damages via credit card.

20. The consumer then receives subsequent calls from the telemarketers or their associates, during which they concoct new phony reasons why the consumer must purchase additional network security software from the telemarketers in order to avoid new cyber-threats. Several consumers have paid over $50,000; one paid almost $400,000 over the course of several years.

21. Since 2013, consumers nationwide have filed well over 500 complaints about the tech support telemarketers on Consumer Sentinel, a consumer complaint database maintained by the FTC.

### *Defendants' Substantial Support and Assistance*

22. The Indian tech support telemarketers contract with individuals and entities in the United States to establish and maintain business accounts on which the scheme depends, facilitate receiving and processing consumers' payments, and provide a general veneer of domestic legitimacy to the scheme. In 2016, Defendants began providing these services to the tech support telemarketers, and thereby began assisting and facilitating the telemarketers in each step of their scheme.

23. Defendant Sambit established and paid for the telephone accounts on which the tech support telemarketers depend in order to conduct their scheme.

Since 2016, Defendants have paid for several telecommunications accounts, providing the telemarketers with multiple telephone numbers with area codes from around the country by which the telemarketers cold-call consumers, one of which is Plaintiff, Mr. Bratic.

24. Sambit established and paid for the remote connection accounts through which the telemarketers access consumers' private computers and claim to remedy serious cyber-threats by installing purportedly high-quality network security software. It is through these remote connection accounts that the tech support telemarketers steal consumers' personal information.

25. Sambit established and paid for the registration, renewal, and hosting of website domains that the tech support telemarketers use to market and legitimize their scheme. Upon belief, since 2016, Defendants have paid for the registration of at least 10 different domains used by the tech support telemarketers.

26. Sambit established and paid for the rental mailbox accounts where the tech support telemarketers direct consumers to send their checks. Defendants collected checks from those mailboxes several times a week.

27. Defendants opened and maintained the bank accounts where Defendants deposited consumers' check, and proceeds from credit card transactions they elicited under false pretenses, as set forth below.

28. Since the beginning of their involvement in the tech support scheme, Sambit has known, or have consciously avoided knowing, of the operation's fraudulent practices.

29. Plaintiff Alexander Bratic is an older Pennsylvanian as defined under the **Older Adults Protective Services. Act** (35 P. S. §§ 10225.101—10225.5102), and has been defrauded and victimized in the manner described above, with both monetary damages, unwarranted access to his personal computer, and a more then fifty unsolicited telephone calls at odd times and occasions.

30. In July of 2018, Bratic, by and through his undersigned attorney, Bratic sent a Cease and Desist letter to the Defendants. See **Exhibit A** hereto.

31. The calls initially ceased however Defendants engaged other similar fraudulent outlets to cold call him, having sold his personal contact information.

32. Defendants used an auto dialer and made "robo-calls" to Mr. Bratic without authorization, on more than 30 occasions in 2018.

33. As further indicia of fraud, several of the business accounts that Defendants opened to facilitate the scheme were subsequently terminated by the account-provider, including at least four bank accounts. Defendants responded by opening new accounts elsewhere.

34. Despite notifications of their involvement in a tech support scam, highly suspicious checks, and terminated accounts, Defendants continued to provide material support for the tech support telemarketers.

## VIOLATIONS OF THE FTC ACT

35. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

36. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

### COUNT I Unfair Acts or Practices

37. In numerous instances, as described in paragraphs 12 through 33 above, Defendants caused or were likely to cause substantial injury to consumers that consumers could not reasonably avoid themselves and that was not outweighed by countervailing benefits to consumers or competition.

38. Therefore, Defendants' practices as described in Paragraph 36 of this Complaint constitute unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

39. In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101 - 6108. The FTC adopted the original TSR in 1995 and extensively amended it in 2003 and 2010. 16 C.F.R. Part 310.

40. Defendants have provided numerous services on behalf of persons who are "seller[s]" or "telemarketer[s]" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

41. It is a violation of the TSR for any person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any practice that violates Section 310.3(a) of the TSR. 16 C.F.R. § 310.3(b).

38. The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, a seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity. 16 C.F.R. § 310.3(a)(2)(vii).

39. The TSR prohibits any seller or telemarketer from making a false or misleading statement to induce any person to pay for goods or services. 16 C.F.R. § 310.3(a)(4).

40. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II
### Assisting and Facilitating Deceptive Telemarketing Acts and Practices

41. In numerous instances, Defendants have provided substantial assistance or support to sellers or telemarketers whom Defendants knew or consciously avoided knowing induced consumers such as the Plaintiff, to pay for goods and services through the use of false or misleading statements, in violation of Section 310.3(a)(2)(iii), (vii), and 310.3(a)(4) of the TSR, as described in Paragraphs 12 through 33 above. 16 C.F.R. § 310.3(a)(2)(iii), (vii), and 310.3(a)(4).

42. Defendants' acts or practices, as described in Paragraph 45 above, are deceptive telemarketing acts or practices that violate Section 310.3(b) of the TSR. 16 C.F.R. § 310.3(b).

## COUNT III
### VIOLATIONS OF TCPA, 47 U.S.C. § 227.

42. In July of 2018, Bratic, by and through his undersigned attorney, Bratic sent a Cease and Desist letter to the Defendants. See **Exhibit A** hereto.

43. The calls initially ceased however Defendants engaged other similar fraudulent outlets to cold call him, having sold his personal contact information.

44. Defendants directly and in collusion with others, used an auto dialer and made "robo-calls" to Mr. Bratic without proper authorization, on more than 30 occasions in 2018, and 2019.

45. Their conduct persist to the date this Complaint is filed.

## COUNT IV
## COMMON LAW FRAUD

43. Defendants made representations of providing legitimate IT related services Mr. Bratic, and inter alia, that they were badly needed.

44. Mr. Bratic reasonably relied on those representations.

45. Defendants knew the representations were false when made, or were reckless as to their truthfulness.

46. Mr. Bratic incurred significant monetary, undue stress, aggravation, humiliation, as a direct and proximate result of his reliance on Defendants' representations.

**WHEREFORE,** Plaintiff, demands judgment against the Defendant individually and jointly and severally for:

    (a)    Statutory Damages;

    (b)    Attorney's fees and costs; and

    (c)    Actual damages

(c)   Permanent Injunction and restitution

(d)   Such other and further relief as the Court shall deem just and proper.

V.   **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury as to all issues so triable.

Respectfully submitted:

Date:   02/25/2019

/s/Predrag Filipovic,*Esq. (312568)*
Attorney for Plaintiff
PREDRAG FILIPOVIC
1735 Market St.Ste 3750
Philadelphia, PA 19103

Enclosures: **Exhibit A.**

# EXHIBIT A

*"IFight4Justice"Law Office of Predrag Filipovic, Esq.,Tel: 267-265-0520, Fax: 215-974-7744*
*BNY Mellon Center 1735 Market St. Suit 3750, Philadelphia, PA, 19103*
*PFesq@ifight4justice.com; www.StopRipoff.com*

---

July 18, 2018

**TECH SOLUTIONS SYNC**

38974 SWORDFISH CMN

Fremont, CA, 94536;
    ATTENTION TO: **Sambit Mivhi Raina**,
CC :
<u>1908 Buckeye Court</u>
<u>Pleasanton CA 94588</u>

    <u>RE: Cease and Desist</u> – Harassment, Fraud, The Electronic Fund Transfer **Act (EFTA)** (15 USC 1693 et seq.)

To Whom It May Concern:

    This CEASE AND DESIST ORDER serves as notice to you and your company to immediately cease and desist all contact and communication with <u>Alexander Bratic</u> regarding any and all matters.

    Your persistent predatory actions have become unbearable. You are harassing Alexander by, but not limited to, installing unwanted malware onto Alexander Bratic's computer in order to force the payment of money to "fix" the frozen computer, threatening to charge the client if he did not call within 24 hours, and calling relentlessly from listed phone numbers and restricted phone numbers demanding payment under threats of charging more fees to the account, all under false pretenses of being affiliated with reputable companies such as Microsoft.

    Your actions are unwanted and are embarrassing, annoying, aggressive, threatening, and violate civil and criminal laws of the United States. As a result of your aggressive and fraudulent harassment, various complaints have been filed with governing authorities and regulatory bodies. In order to AVOID COMPLAINTS TO STATE AND FEDERAL LAW ENFORCMENT, YOU ARE TO IMMEDIATELY CESE ALL CONTACT WITH OUR CLIENT.

*"IFight4Justice"Law Office of Predrag Filipovic, Esq.,Tel: 267-265-0520, Fax: 215-974-7744*
*BNY Mellon Center 1735 Market St. Suit 3750, Philadelphia, PA, 19103*
*PFesq@ifight4justice.com; www.StopRipoff.com*

---

Due to the volume of fraud complaints against you, publically available on the world wide web, your credit card processor has incurred liability as well, jointly, and severally, under civil conspiracy and fraudulent contribution.

Sincerely,

Predrag Filipovic, Esquire

1735 Market Street | Suite 3750

Philadelphia, PA  19103

pfesq@ifight4justice.com